Filed 6/29/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>BAY AREA TOLL AUTHORITY et al.,<br><br>      Defendants and Respondents. | A157598<br><br>(San Francisco County<br> Super. Ct. No. CGC18567860) |
| RANDALL WHITNEY,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>METROPOLITAN TRANSPORTATION COMMISSION,<br><br>      Defendant and Respondent. | A157972<br><br>(San Francisco County<br> Super. Ct. No. CPF18516276) |

These consolidated appeals challenge a toll increase for seven Bay Area bridges that was submitted to the voters as Regional Measure 3 in 2018, and approved by a 55 percent majority. Revenue from the toll increase is to be applied toward various designated highway and public transit improvement projects and programs. Appellants contend that most of the revenue will not be used for the benefit of those who use the bridges and pay the toll but rather for the benefit of those who use other means of transportation. For this reason, they maintain the toll increase is a tax for which the California Constitution requires a two-thirds majority vote, and therefore is invalid.

The trial court granted motions for judgment on the pleadings in favor of respondents. We affirm.

## BACKGROUND

Respondent Metropolitan Transportation Commission (MTC) is a "local area planning agency" created by the Legislature "to provide comprehensive regional transportation planning for the region comprised of the City and County of San Francisco and the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano, and Sonoma." (Gov. Code, § 66502.) Respondent Bay Area Toll Authority (BATA) is a "public instrumentality governed by the same board as that governing" the MTC, but "a separate entity from" the MTC. (Sts. & Hy. Code, § 30950.)[1] BATA "is responsible for the administration of all toll revenues from state-owned toll bridges within the geographic jurisdiction of" the MTC. (§ 30950.2, subd. (a).)

In 2017, the Legislature passed Senate Bill No. 595 (Sen. Bill 595) by margins of 67 percent in the Senate and 54 percent in the Assembly. The bill stated the Legislature's intent "to require the Metropolitan Transportation Commission to place on the ballot a measure authorizing the voters to approve an expenditure plan to improve mobility and enhance travel options on the bridges and bridge corridors to be paid for by an increase in the toll rate on the seven state-owned bridges within its jurisdiction." (Stats. 2017, Sen. Bill 595 (2017–2018 Reg. Sess.), ch. 650, § 1.) Senate Bill 595 enacted statutes directing the Board of Supervisors for the City and County of San Francisco and Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano, and Sonoma to call a special election at which a proposed toll increase for the seven state-owned Bay Area bridges would be

[1] Further statutory references will be to the Streets and Highways Code except as otherwise specified.

submitted to the voters as "Regional Measure 3" (RM3).  (§ 30923, subds. (a), (b) & (c).)[2]  BATA was directed to "select an amount of the proposed increase in the toll rate, not to exceed three dollars" and "determine the ballot question, which shall include the amount of the proposed toll increase selected pursuant to subdivision (a) and a summary of the Regional Measure 3 expenditure plan."  (§ 30923, subd. (c)(2).)  The "Regional Measure 3 expenditure plan," set forth in section 30914.7, described 35 specific projects and programs for improvements to highways and public transportation that "have been determined to reduce congestion or to make improvements to

_____

[2] These subdivisions of section 30923 provide:

"(a) For purposes of the special election to be conducted pursuant to this section, the authority shall select an amount of the proposed increase in the toll rate, not to exceed three dollars ($3), for vehicles crossing the bridges described in Section 30910 to be placed on the ballot for approval by the voters.

"(b) The toll rate for vehicles crossing the bridges described in Section 30910 shall not be increased by the rate selected by the authority pursuant to subdivision (a) prior to the availability of the results of a special election to be held in the City and County of San Francisco and the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano, and Sonoma to determine whether the residents of those counties and of the City and County of San Francisco approve the toll increase.

"(c)(1) Notwithstanding any provision of the Elections Code, the Board of Supervisors of the City and County of San Francisco and of each of the counties described in subdivision (b) shall call a special election to be conducted in the City and County of San Francisco and in each of the counties that shall be consolidated with a statewide primary or general election, which shall be selected by the authority.

"(2) The authority shall determine the ballot question, which shall include the amount of the proposed toll increase selected pursuant to subdivision (a) and a summary of the Regional Measure 3 expenditure plan. The ballot question shall be submitted to the voters as Regional Measure 3 and stated separately in the ballot from state and local measures."

travel in the toll bridge corridors," to be funded by toll bridge revenues in an amount specified for each of the lists projects and programs. (§ 30914.7.)

On January 24, 2018, BATA adopted Resolution No. 123, calling for the counties to place RM3 on the ballot for the June 5, 2018, election. The ballot question posed in RM3 was as follows: "BAY AREA TRAFFIC RELIEF PLAN. Shall voters authorize a plan to reduce auto and truck traffic, relieve crowding on BART, unclog freeway bottlenecks, and improve bus, ferry, BART and commuter rail service as specified in the plan in this voter pamphlet, with a $1 toll increase effective in 2019, a $1 increase in 2022, and a $1 increase in 2025, on all Bay Area toll bridges except the Golden Gate Bridge, with independent oversight of all funds?" On June 5, 2018, voters approved RM3 by a 55 percent margin (<https://mtc.ca.gov/our-work/fund-invest/toll-funded-investments/reginional-measure-3> [as of 6/29/20]).[3]

Appellants Howard Jarvis Taxpayers Association (HJTA) and three named individuals filed a complaint against BATA and the California Legislature, seeking to invalidate the toll increases. The first cause of action alleged the toll increase was a tax that Senate Bill 595 "authoriz[ed] BATA to impose" and both Senate Bill 595 and the toll increase were invalid due to failure to comply with article XIII A, section 3, subdivision (a), of the California Constitution: "Any change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the

_____

[3] Appellants ask us to take judicial notice of BATA's Resolution No. 123 (calling for the special election) and Resolution No. 126 (confirming receipt and acceptance of the election results), and we do so. We additionally take judicial notice of the statutes attached as exhibits 3, 4, and 5 to appellants' request for judicial notice, and the table published on MTC's website attached as exhibit 3 to the request for judicial notice.

4

Legislature." (Cal. Const., art. XIII A, § 3, subd. (a).)[4] The second cause of action alleged the toll was a local tax imposed by BATA, and was invalid for failure to comply with article XIII C, § 2, subdivision (d): "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote."

Separately, respondent Randall Whitney filed a lawsuit against MTC alleging Senate Bill 595 and RM3 were unconstitutional for failure to comply with the two-thirds vote requirement of article XIII C.

BATA and the Legislature each moved for judgment on the pleadings against the HJTA complaint on the basis that the bridge toll increase was imposed by the Legislature in Senate Bill 595, with certain aspects of implementation delegated to BATA, and was not a tax as defined by the California Constitution, but rather a charge for entrance to and use of state-owned property (art. XIII A, § 3). These motions were granted without leave to amend. As to the first cause of action, the court held the Legislature "met its burden to show the applicability of the exception for 'entrance to or use of state property' from the general definition of 'tax' in article XIII A, section 3(b)(4)," and therefore the toll increase was not a tax subject to the two-thirds vote requirement. The court granted BATA's motion as to the second cause of action because the definition of tax in article XIII C applies only to local governments and the toll increase was imposed by the Legislature, with BATA "charged with implementing that state mandate."

MTC also moved for judgment on the pleadings, arguing it was not a proper defendant because the Legislature, not MTC, enacted Senate Bill 595 and mandated the special election seeking voter approval for the increased

---

[4] Unspecified references to "article" will refer to the California Constitution.

5

tolls. The trial court granted this motion, too, without leave to amend, because the Legislature imposed the toll increase and MTC's responsibility "merely consists of overseeing transportation projects funded by the bridge toll revenues after they are collected and preparing a summary of the expenditure plan under Regional Measure 3." The court noted that Whitney's "conflation of [MTC] with" BATA did not help his argument because BATA had only limited areas of discretion and was "required to carry out the increase enacted by the Legislature."

HJTA and Whitney each appealed. Whitney, who had represented himself in the trial court, substituted HJTA's counsel for the appeal. We granted appellants' unopposed motion to consolidate the appeals.

## DISCUSSION

" 'A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. (Code Civ. Proc., § 438, subd. (c)(3)(B)(ii).) A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.' (*Kapsimallis v. Allstate Ins. Co.* (2002) 104 Cal.App.4th 667, 672.) 'All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law. . . .' (*Ibid.*) Courts may consider judicially noticeable matters in the motion as well. (*Ibid.*)" (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.)

Appellants argue that the toll increase at issue here is a tax, and is invalid because Senate Bill 595 was not approved by a two-thirds majority of the Legislature and RM3 was not approved by a two-thirds majority of the electorate. Pursuant to article XIII A, section 3, subdivision (a), "[a]ny change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members

6

elected to each of the two houses of the Legislature . . . ."[5]  Article XIII C, section 2, requires that all tax increases imposed by local governments be approved by the voters.[6]  A "general tax"—"any tax imposed for general governmental purposes"—may be approved by a majority vote.  (Art. XIII C, § 3, subd. (b).)  A "special tax"—one imposed "for specific purposes" or by "special purpose districts or agencies"—requires approval by a two-thirds vote.  (Art. XIII C, §§ 2, subd. (a), 3, subd. (d).)

Appellants' case turns on the definition of "tax" in the California Constitution, which in turn depends on whether the increase was imposed by the Legislature (art. XIII A, § 3, subd. (b)) or by local government (art. XIII C, § 1, subd. (e)).  Under article XIII A, section 3, subdivision (b), " 'tax' means

---

[5] "Article XIII A was enacted by the voters in 1978 and is commonly referred to as Proposition 13.  It is comprised of four major elements, a real property tax rate limitation (§ 1), a real property assessment limitation (§ 2), a restriction on state taxes (§ 3) and a restriction on local taxes (§ 4).  (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231.)  These four elements form an interlocking package deemed necessary by the initiative's framers to assure effective real property tax relief.  (*Ibid.*)" (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 187.)

[6] Article XIII C was adopted by the voters in 1996 as part of Proposition 218.  "The initiative measure's findings and declaration of purpose stated: 'The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases.  However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself.  This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent.'  (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 2, p. 108, see Historical Notes, 2A West's Ann. Cal. Const. (2013 supp.) foll. art. XIII C, § 1, p. 171.)" (*Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1320 (*Schmeer*).)

any levy, charge, or exaction of any kind imposed by the State, except" five enumerated exceptions. Article XIII C, section 1, subdivision (e), defines "tax" as "any levy, charge, or exaction of any kind imposed by a local government, except" seven enumerated exceptions. Accordingly, we must first determine whether the toll increase was imposed by the Legislature, as the trial court found, or by BATA, as appellants maintain, and then determine whether the increase was in fact a "tax" within the applicable definition.[7]

---

[7] Respondents argue that appellants waived the issue of which entity imposed the toll increase by failing to object to the trial court's tentative decision on this point. As reflected in the reporter's transcript of the hearing after the trial court issued its tentative decision finding the Legislature imposed the increase, appellants' counsel told the court, "we're not challenging the court's decision that the toll increase was imposed by the State. It was not imposed by [BATA], so I imagine that excuses [BATA] *from the case,* and we won't need to hear from [counsel for BATA]."

Appellants maintain they challenged the tentative ruling only as to the issue of whether the toll increase was a tax because counsel did not believe he could change the court's mind about which entity imposed the toll increase. They argue they did not have an opportunity to review the reporter's transcript before it was finalized, and the transcript is inaccurate in that the italicized language quoted above should have read "for today." As evidence appellant's attorney did not have an opportunity to review the transcript, appellants point out that his name is spelled incorrectly throughout the transcript, as "Biddle" rather than "Bittle."

We will give appellants the benefit of the doubt. If appellants had not challenged the tentative ruling at all, they could have appealed all the issues decided by the trial court. "Submission on a tentative ruling is neutral; it conveys neither agreement nor disagreement with the analysis." (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.) Absent the challenged reference to BATA being excused "from the case," appellants' attorney's remarks are easily read as stating acceptance of the court's ruling that the Legislature imposed the toll increase *for purposes of the hearing on objections to the tentative ruling,* not a concession that the tentative ruling was correct on that

## I.

Arguing that the toll increase was imposed by BATA, appellants maintain that Senate Bill 595 was not self-executing, contrasting it with a toll increase imposed in 1997 to fund seismic retrofitting. Section 31010, subdivision (a), enacted by Senate Bill No. 60 in 1997, provides, "*There is hereby imposed* a seismic retrofit surcharge equal to one dollar ($1) per vehicle for passage on the bay area bridges, except for vehicles that are authorized toll-free passage on these bridges." (Italics added.) Appellants emphasize that Senate Bill 595 does not contain the italicized language, describing the legislation as instead having "granted authority to BATA to propose a toll" conditioned on voter approval (§ 30923, subd. (b)),[8] and maintaining that if BATA took no action or the voters rejected the measure, there would have been no toll increase.

The language of Senate Bill 595 belies appellants' characterization of it as having simply delegated authority to BATA to decide whether to impose a toll increase.

Preliminarily, the Legislature's findings and declarations in section 1 of Senate Bill 595 include the statement, "[t]o improve the quality of life and sustain the economy of the San Francisco Bay area, it is the intent of the Legislature to require the Metropolitan Transportation Commission to place

point. In any event, the issue is a question of law, which this court can and will decide.

[8] "The toll rate for vehicles crossing the bridges described in Section 30910 shall not be increased by the rate selected by the authority pursuant to subdivision (a) prior to the availability of the results of a special election to be held in the City and County of San Francisco and the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano, and Sonoma to determine whether the residents of those counties and of the City and County of San Francisco approve the toll increase." (§ 30923, subd. (b).)

9

on the ballot a measure authorizing the voters to approve an expenditure plan to improve mobility and enhance travel options on the bridges and bridge corridors to be paid for by an increase in the toll rate on the seven state-owned bridges within its jurisdiction." (Stats. 2017, ch. 650, § 1, subd. (m).)

Senate Bill 595 added section 30923, which required the board of supervisors in each of the specified Bay Area counties to call a special election: "Notwithstanding any provision of the Elections Code, the Board of Supervisors of the City and County of San Francisco and of each of the counties described in subdivision (b) *shall* call a special election to be conducted in the City and County of San Francisco and in each of the counties that shall be consolidated with a statewide primary or general election, which shall be selected by [BATA]." (§ 30923, subd. (c)(1), italics added.)[9]

Senate Bill 595 required BATA to select the amount of the toll increase to be proposed, up to the $3 maximum set by the Legislature, and to submit the proposed increase to the voters together with the expenditure plan specified by the Legislature: "For purposes of the special election to be conducted pursuant to this section, [BATA] *shall* select an amount of the proposed increase in the toll rate, not to exceed three dollars ($3) . . . ." (§ 30923, subd. (a), italics added.) "[BATA] *shall* determine the ballot question, which *shall* include the amount of the proposed toll increase selected pursuant to subdivision (a) and a summary of the Regional Measure

---

[9] The counties listed in subdivision (b) of section 30923 are San Francisco, Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano, and Sonoma.

The text of Senate Bill 595 and statutes refer to the " 'Authority,' " which is defined as BATA. (§ 30910.5.)

3 expenditure plan." (§ 30923, subd. (c)(2).) Senate Bill 595 amended section 30916, which sets forth the base toll rates for state-owned bridges within MTC's jurisdiction, by adding a new subdivision (c)(1): "If the voters approve a toll increase, pursuant to Section 30923, [BATA] *shall* increase the base toll rate for vehicles crossing the bridges described in subdivision (a) from the toll rates then in effect by the amount approved by the voters pursuant to Section 30923." (§ 30916, subd. (c)(1), italics added.)

These provisions impose mandatory obligations upon BATA; nothing in Senate Bill 595 indicates the Legislature merely authorized BATA to impose a toll increase, or that BATA had any power to choose not to place a proposed toll increase on the ballot or to not implement a toll increase approved by the voters. Consistent with BATA's role as the entity "responsible for the administration of all toll revenues from state-owned toll bridges within the geographic jurisdiction of the Metropolitan Transportation Commission" (§ 30950.2, subd. (a)), Senate Bill 595 required imposition of a toll increase of up to $3, subject to approval by the voters, and specified in great detail the uses to which the resulting revenue would be put[10] and certain

---

[10] As indicated above, Senate Bill 595 enumerated the specific projects and programs to which funds raised by the toll increase were to be applied, with specific dollar amounts for each listed project or program. (§ 30914.7, subd. (a).) It further specified a maximum percentage of revenue generated by the toll increase to be made available annually for operating assistance for specified public transportation purposes, subject to specified procedures. (§ 30914.7, subd. (c).)

administrative requirements,[11] while leaving some details of the implementation and administration of the toll increase to BATA.[12]

Appellants point to subdivision (f) of section 30923 as providing that if the voters approved the toll increase, BATA *could* adopt it, but was not required to do so.  The subdivision states, "If a majority of all the voters voting on the question at the special election do not approve the toll increase, the authority *may* by resolution resubmit the measure to the voters at a subsequent statewide primary or general election.  If a majority of all of the voters vote affirmatively on the measure, the authority *may* adopt the toll increase and establish its effective date and establish the completion dates

---

[11] For example, BATA "shall reimburse each county and city and county participating in the election for the incremental cost of submitting the measure to the voters" from toll revenues (§ 30923, subd. (g)(2)); if the toll increase is approved by the voters, BATA "shall establish an independent oversight committee within six months of the effective date of the toll increase to ensure that any toll revenues generated pursuant to this section are expended consistent with the applicable requirements set forth in Section 30914.7," with specified requirements for the representatives to and responsibilities of this committee (§ 30923, subd. (h)(1)); if the toll increase is approved by the voters, BATA "shall annually prepare a report to the Legislature . . . on the status of the projects and programs funded pursuant to Section 30914.7" (§ 30923, subd. (i)); BATA "shall" proportionately adjust the funding assigned to each project and program if it selected a toll increase less than the maximum $3 (§ 30914.7, subd. (b)).

[12] For example, BATA "shall select an amount of the proposed increase in the toll rate, not to exceed three dollars ($3)" (§ 30923, subd. (a)); BATA "shall determine the ballot question," although that question "shall include the amount of the proposed toll increase selected pursuant to subdivision (a) and a summary of the Regional Measure 3 expenditure plan" and "shall be submitted to the voters as Regional Measure 3 and stated separately in the ballot from state and local measures" (§ 30923, subd. (c)(2)); if the increase is approved by the voters, BATA "may phase in the increased toll schedule consistent with subdivision (c) of Section 30916" (§ 30923, subd. (e)).

for all reports and studies required by Sections 30914.7 and 30950.3." (§ 30923, subd. (f), italics added.)

Appellants read the second sentence of subdivision (f) out of context. As described above, section 30916, subdivision (c)(1), *requires* BATA to increase the toll discussed in section 30923 if the increase is approved by the voters: "If the voters approve a toll increase, pursuant to Section 30923, [BATA] *shall* increase the base toll rate for vehicles crossing the bridges described in subdivision (a) from the toll rates then in effect by the amount approved by the voters pursuant to Section 30923." (§ 30916, subd. (c)(1), italics added.) Appellants' interpretation of section 30923, subdivision (f), ignores and directly conflicts with section 30916, subdivision (c)(1).

Under established rules of statutory construction, " 'statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.' (*Dyna–Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387.)" (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110.) Subdivision (f) of section 30923 begins with the scenario in which the proposed toll increase does *not* garner a majority vote of the electorate; in this situation, BATA "may by resolution resubmit the measure to the voters at a subsequent statewide primary or general election." The next sentence states, "[i]f a majority of all of the voters vote affirmatively on the measure, [BATA] may adopt the toll increase . . . ." The most reasonable interpretation of this second sentence is that it follows from the first: If the measure initially submitted to the voters does not pass, BATA "may" resubmit it at a subsequent election, and if it passes at this subsequent election, BATA "may" adopt the increase. This interpretation avoids conflict with section 30916, subdivision (c)(1). If the proposed toll increase section 30923 requires BATA

13

to submit to the voters is approved, section 30916, subdivision (c)(1), requires BATA to impose it ("shall increase the base toll rate"); if the proposed toll increase section 30923 requires BATA to submit to the voters is *not* approved, BATA has authority to resubmit the measure but is not required to do so ("may by resolution resubmit"), and if the resubmitted measure passes, BATA has authority to impose the increase.

This reading of subdivision (f) is also consistent with the immediately preceding subdivision of section 30923, which references section 30916. Section 30923, subdivision (e), provides, "The county clerks shall report the results of the special election to [BATA]. If a majority of all voters voting on the question at the special election vote affirmatively, the authority may phase in the increased toll schedule consistent with subdivision (c) of Section 30916." This language does not offer BATA the option of not implementing the approved increase, but allows BATA to implement it in stages. Section 30916, subdivision (c)(1), after stating that BATA "shall" increase the base toll rate in the amount of the increase approved by the voters, provides that BATA "may, beginning six months after the election approving the toll increase, phase in the toll increase over a period of time."

Appellants rely upon *Howard Jarvis Taxpayers Assn. v. Fresno Metropolitan Projects Authority* (1995) 40 Cal.App.4th 1359 (*Fresno*), which they say considered language similar to Senate Bill 595 and concluded the tax at issue was imposed by the local entity. The legislation at issue was former Government Code section 68059.7, which provided that the Fresno Metropolitan Projects Authority (Authority), "subject to the approval of a majority vote by the voters, *may impose a retail transactions and use tax* at a maximum rate of one-tenth of 1 percent under this title." (*Fresno,* at p. 1373.) The statute further directed: " '[T]he authority at the next

14

municipal election, or upon a majority vote of the authority, at any municipal or countywide election prior to December 31, 1994, shall submit to the voters within its geographical boundaries the question of *whether the authority shall be authorized to levy and collect transactions and use taxes* for the purpose stated in this title. . . .' (Italics added.)" (*Ibid*.)

*Fresno* was not concerned with any question about which governmental entity imposed the tax at issue. The problem in that case was that the Authority was held to be a private body because 11 of its 13 members were chosen "by private entities who have no public accountability." (*Fresno, supra,* 40 Cal.App.4th at p. 1388.) Accordingly, the court held the Legislature's delegation to the Authority of the power to levy a tax violated the state Constitution's proscription against such delegation to a private entity. (*Fresno,* at p. 1362; Cal. Const., art. XI, § 11, subd. (a).)

There was no suggestion in *Fresno* that the Legislature itself imposed the tax at issue.[13] The question the Legislature *required* to be submitted to the voters was not whether the specified tax should be imposed but " 'whether the authority shall be authorized to levy and collect transactions and use taxes for the purpose stated in this title.' " (*Fresno, supra,* 40 Cal.App.4th at p. 1373.) The Legislature *authorized* the Authority to impose the tax ("may impose"), subject to the voters' approval of the tax and of the Authority's authority to levy and collect such taxes. (*Fresno,* at p. 1373.) The issues addressed in that case are entirely different from those before us.

Appellants view section 30923, subdivision (j), as evidence the toll increase was imposed by BATA, not the Legislature. Section 30923, subdivision (j) states that, with specified exceptions, "the toll increase

---

[13] The court rejected the suggestion that the voters levied the tax upon themselves. (*Fresno, supra,* 40 Cal.App.4th at pp. 1363, 1373–1374.)

15

adopted by [BATA] pursuant to this section shall not be changed without statutory authorization by the Legislature." Appellants emphasize the language "adopted by [BATA]," having previously stated that the California Supreme Court has said "[w]hen article XIII C uses the term 'impose' it means 'adopt' or 'enact.' (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 944.)" *California Cannabis Coalition* discussed the terms "impose" and "enact" being used interchangeably in the context of rejecting an argument that "impose" includes collection of taxes. (*Id*. at p. 944.) The opinion did not specifically address the meaning of "adopt."

"Enact" is defined by the Merriam Webster Dictionary as "to establish by legal and authoritative act" (<merriam-webster.com/dictionary/enact> [as of 6/29/20]). "Impose" is defined as "to establish or apply by authority" (<merriam-webster.com/dictionary/impose> [as of 6/29/20]). By contrast, "adopt" is defined as "to take up and practice or use" and "to accept formally and put into effect" (<merriam-webster.com/dictionary/adopt> [as of 6/29/20]).[14]

Read in context, subdivision (j) of section 30923 clearly uses "adopted" in the sense of "accept formally and put into effect" rather than "enact" or "impose." Subdivision (j) refers to the toll increase "adopted by the authority pursuant to this section." Section 30923 requires BATA to select ("shall select") an amount not to exceed $3 (§ 30923, subd. (a)), and to submit ("shall

---

[14] Black's Law Dictionary defines these terms similarly. "Enact" means "[t]o establish by law; to perform or effect; to decree" (<freelawdictionary.org/ ?s=enact> [as of 6/29/20]); "impose" means "to place a tax or a levy or a burden on a person" (<freelawdictionary.org/?s=impose> [as of 6/29/20]); and "adopt" means "[t]o accept, appropriate, choose, or select" and "[t]o accept, consent to, and put into effective operation" (<the freelawdictionary.org/ adopt/> [as of 6/29/20]).

submit") that amount to the voters in a special election as a proposed toll increase (§ 30923, subd. (c)(1)), and prohibits BATA ("shall not") from increasing the toll prior to approval by the voters (§ 30923, subd. (b)); once so "adopted," the toll increase "shall not" be changed without statutory authorization (§ 30923, subd. (j)). Following the steps described in section 30923, BATA did not enact the toll increase; it implemented the toll increase the Legislature enacted and made conditional upon approval by the voters—consistent with BATA's statutory responsibility for "administration of all toll revenues from state-owned toll bridges" within MTC's jurisdiction. (§ 30950.2, subd. (a).)

Appellants find proof the toll increase was imposed by BATA, not the Legislature, in *Schmeer, supra,* 213 Cal.App.4th at pages 1326–1329, which they describe as holding that "a tax is 'imposed' by a governmental entity if it is paid to that entity or remitted to that entity." Here, appellants urge, revenue from the toll increase is collected by BATA, deposited into BATA's account, and spent by BATA, with oversight by a committee established by BATA rather than oversight by the state. (§§ 30911, 30914.7, subd. (a), 30923, subd. (h).)

*Schmeer* involved a county ordinance prohibiting retail stores from providing plastic carryout bags and requiring stores to charge 10 cents for each paper bag provided to a customer. The ordinance was challenged as a tax imposed without the voter approval required by article XIII C, section 2. *Schmeer* held the paper bag charge was not a tax because it was payable to and retained by the retail store, was not remitted to the county, and raised no revenue for the county. (*Schmeer, supra,* 213 Cal.App.4th at p. 1329.)

The situation in the present case is completely different. Pursuant to section 30911, subdivision (a), BATA must maintain accounts "necessary and

17

appropriate to document toll revenue and operating expenditures in accordance with generally accepted accounting principles." Section 30911 describes the order in which BATA must direct revenue to projects and programs specified in enumerated statutes. (§ 30911, subd. (b)(1).) The "independent oversight committee" Senate Bill 595 requires BATA to establish, which must include two representatives from each county within the jurisdiction of the MTC, is required to "ensure that any toll revenues generated pursuant to this section are expended consistent with the applicable requirements set forth in Section 30914.7," and to annually "review the expenditure of funds by [BATA] for the projects and programs specified in Section 30914.7" and report its findings "to the transportation committee of each house of the Legislature." (§ 30923, subd. (h)(2).) Unlike the situation in *Schmeer,* there is no question that the toll increase revenues are remitted to a governmental entity. Again, the role assigned to BATA with respect to the revenue generated pursuant to Senate Bill 595 is consistent with BATA's statutory role as the administrative arm of the state responsible for implementing the toll increase imposed by the Legislature according to the detailed parameters set by the Legislature.

Appellants contend the fact that Senate Bill 595 required an election before the toll increase could be imposed is proof the Legislature did not impose the increase itself, because it could have imposed the increase without voter approval. The premise of this argument is faulty. " '[U]nlike the United States Congress, which possesses only those specific powers delegated to it by the federal Constitution, it is well established that the California Legislature possesses plenary legislative authority except as specifically limited by the California Constitution.' ([*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 31.) Lying at the core of that plenary

18

authority is the power to enact laws. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254.) It has been said that pursuant to that authority, '[t]he Legislature has the actual power to pass any act it pleases,' subject only to those limits that may arise elsewhere in the state or federal Constitutions. (*Nougues v. Douglass* (1857) 7 Cal. 65, 70.)" (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 497–498 (*Padilla*).) That the Legislature had the power to enact legislation without submission of the question to the voters does not preclude the Legislature from choosing to make the legislation conditional upon voters' approval. (*People ex rel. Graves v. McFadden* (1889) 81 Cal. 489, 495 (*Graves*) [act to create County of Orange, conditioned upon assent of two thirds of the electors, not an invalid delegation of legislative authority].)[15] Appellants identify no constitutional impediment to the Legislature imposing a regional toll increase conditional upon approval of the region's voters.[16]

---

[15] The *Graves* court, referring to a legal treatise, stated, "No doubt the Legislature had the power to create a new county without submitting the question to a vote of the people, as Congress had the power to admit California into the Union without an enabling act; but as the burdens of the new local government were to be mainly borne by the people within the territory, it was, in the language of Mr. Cooley, 'with propriety referred to the voters for decision,' and they were permitted, and by pursuing the course prescribed by the terms of the act enabled, to assume the position of a county in the state, and the burdens of a county government, or not, as they should elect; just as four states were at about the same time permitted and enabled to assume the position and burdens of states in the Union, or not, as the people thereof respectively should at the polls decide." (*Graves, supra,* 81 Cal. at p. 495.)

[16] Appellants offer *Padilla* as an example of the Legislature being "constitutionally authorized" to place a statewide advisory measure on the ballot "in certain cases," then argue "this is not one of those cases." No one has suggested it is. But as indicated above, *Padilla* itself reiterates the rule that the Legislature's power to enact legislation is limited only by the state and federal Constitutions. (*Padilla, supra,* 62 Cal.4th at p. 498.) That

19

Appellants offer two examples in their reply brief for the proposition that the Legislature requiring a local agency to hold an election does not mean the resulting voter-approved proposal was enacted by the Legislature. First, appellants' point to the Los Angeles County Flood Control Act (Wat. Code App., ch. 28, § 28-1 et seq.), which requires the county board of supervisors, after adopting an engineers' report on a flood control plan, to call a special election, submit a bond proposal to the voters with specified information about the purposes and costs of the proposal. (*Id.*, §§ 28-4, 28-5.) If approved by the voters, the bonds "shall be issued and sold" and the board of supervisors "shall levy a tax" each year upon taxable property in the district sufficient to pay the interest on and portion of the principal of the bonds to become due. (*Id.*, § 28-10.)

Quoting *Inglewood v. County of Los Angeles* (1929) 207 Cal. 697, 698–699 (*Inglewood*), appellants state, "Although the 'Los Angeles County Flood Control District was created by an act of the Legislature of the State of California . . . [t]hese special assessments were levied by the county officials of said County of Los Angeles, acting for and on behalf of the Los Angeles Flood Control District.' " Appellants emphasize that, as with Senate Bill 595, the Flood Control Act required the local government to determine the amount of the proposed bonds, call a special election, submit the question to the voters with specified information and, if approved by the voters, issue the bonds and levy a tax to cover the payments on the bonds.

Senate Bill 595, however, differs significantly from the Flood Control Act at issue in *Inglewood*. The Flood Control Act expressly directed the local

---

Senate Bill 595 is not the type of legislation found permissible in *Padilla* in no way suggests Senate Bill 595 was not a valid exercise of legislative authority.

20

governmental entity to "levy" the assessment. There was no question in the case as to which entity imposed the levy; the statement quoted above was simply a description of the facts of the case. The disputed issue was whether certain property in the district was subject to the assessment.

A grant of authority from the Legislature "is an essential prerequisite to all local taxation, because local governments have no inherent power to tax." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 247–248.) And while the Legislature "may authorize local governments to impose" taxes for local purposes, it may not impose local taxes itself. (*Santa Clara County Local Transportation Authority,* at p. 247; Cal. Const., art. XIII, § 24.) The Flood Control Act listed among the Flood Control District's powers, " 'to cause taxes to be levied and collected for the purpose of paying any obligation of the district in the manner hereinafter provided.' " (*Los Angeles County Flood Control Dist. v. Hamilton* (1917) 177 Cal. 119, 122; Wat. Code App., ch. 28, § 28-2, subd. 8.) The legislation creating BATA did not give it authority to levy taxes (Sts. & Hy. Code, § 30951), and *Inglewood* does not help resolve whether the Legislature in Senate Bill 595 provided BATA with authority to impose the toll increase, or imposed the toll increase itself, to be implemented by BATA.

Appellants' second example is the San Diego County Regional Justice Facility Financing Act (Act). (Former Gov. Code, § 26250 et seq.) The Legislature, in recognition of the need for improved courtrooms and jails in San Diego County, passed this legislation creating the San Diego County Regional Justice Facility Financing Agency and charging it with adopting a tax ordinance imposing a supplemental sales tax of one-half of one percent in order to finance construction of such facilities. (*Rider v. County of San Diego* (1991) 1 Cal.4th 1, 5 (*Rider*).) The legislation "provided for a countywide

21

election held for the purpose of approving the tax ordinance by simple majority vote" and limited the agency's tax power to the specified sales tax. (*Rider,* at p. 5.) The Act required the agency to adopt a tax in accordance with former Government Code section 26275, which provided that "[t]he agency, subject to the approval of the voters, may impose a tax rate of one-half of 1 percent," and set maximum for the combined rate of local sales or transactions and use taxes in the county (former Gov. Code, §§ 26273, 26276). Appellants state that despite the "state-created agency" being required by the Legislature "to do all of the same things that BATA and MTC were required or authorized to do under Senate Bill 595," the *Rider* court "deemed the tax increase a *locally*-imposed levy."

The *Rider* court did not "deem" the tax increase a locally imposed levy; the case presented no question as to what entity imposed the tax, and the court did not address any such question. The issue in *Rider* was whether the Legislature created the agency in a deliberate attempt to circumvent the requirement of article XIII A, section 4, that special taxes imposed by special districts must be approved by a two-thirds majority of the electorate.[17] Concluding that the record supported the trial court's "finding of 'purposeful

_____

[17] Article XIII A, section 4, provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." In *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 205–207 (*Richmond*)), the California Supreme Court held that the "special districts" to which this constitutional requirement applies are only those "which have the power to levy a tax on real property." The dissent in that case predicted this holding would lead to efforts to avoid the constitutional supermajority requirement by having the Legislature create special districts without power to impose property taxes. (*Richmond,* at p. 213, diss. opn. of Richardson, J.) This was the problem confronted in *Rider*. (*Rider, supra,* 1 Cal.4th at p. 8.)

circumvention' " and that the framers of article XIII A, section 4, and voters who adopted it would not have intended to adopt a definition of special district "that could so readily permit circumvention of section 4," *Rider* held that "special district" includes "any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Rider, supra,* 1 Cal.4th at p. 11.) *Rider* held the tax invalid because it had not been approved by two-thirds of the electorate.

Appellants' reliance upon *Inglewood* and *Rider* as support for finding BATA imposed the toll increase in the present case is misplaced. Neither addressed any question as to whether the taxes at issue in those cases were imposed by the Legislature or by the local governmental entity.

We agree with the trial court that the Legislature, not BATA, imposed the toll increase in Senate Bill 595.

## II.

As indicated above, section 3, subdivision (a), of article XIII A provides that "[a]ny change in state statute which results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."

Section 3, subdivision (b), of article XIII A, adopted by Proposition 26 in 2010, provides the applicable definition of "tax":

"As used in this section, 'tax' means any levy, charge, or exaction of any kind imposed by the State, except the following:

"(1) A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and

23

which does not exceed the reasonable costs to the State of conferring the benefit or granting the privilege to the payor.

"(2) A charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the State of providing the service or product to the payor.

"(3) A charge imposed for the reasonable regulatory costs to the State incident to issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof.

"(4) A charge imposed for entrance to or use of state property, or the purchase, rental, or lease of state property, except charges governed by Section 15 of Article XI [allocation of vehicle license fees].

"(5) A fine, penalty, or other monetary charge imposed by the judicial branch of government or the State, as a result of a violation of law." (Art. XIII A, § 3, subd. (b).)

Section 3, subdivision (d), of article XIII A provides, "The State bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity."

Prior to the adoption of Proposition 26, "case law distinguish[ed] between taxes subject to the requirements of article XIII A, . . . on the one hand, and regulatory and other fees, on the other." (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191,

24

1210 (*City of San Buenaventura*).) As the Supreme Court has described this distinction, " '[i]n general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted.' " (*Ibid.*, quoting *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874.) Accordingly, "a fee does not become a tax subject to article XIII A unless it ' " 'exceed[s] the reasonable cost of providing services . . . for which the fee is charged' " ' " and " ' "the basis for determining the manner in which the costs are apportioned" ' should demonstrate that ' "charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." ' " (*City of San Buenaventura*, at p. 1210, quoting *Sinclair Paint Co.,* at pp. 876, 878.)

Proposition 26, which "expanded the definition of taxes so as to include fees and charges, with specified exceptions," was an "effort to close perceived loopholes" in prior efforts to restrict taxation. (*Schmeer, supra,* 213 Cal.App.4th at p. 1322; *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1047.) Proposition 26 "addressed the problem of state and local governments disguising taxes as fees, with the burden on the government to prove that the so-called fee is not in fact a tax." (*Johnson v. County of Mendocino* (2018) 25 Cal.App.5th 1017, 1033.)

The trial court concluded the toll increase is not a tax because it is a "charge imposed for entrance to or use of state property" under the exception stated in paragraph (4) of article XIII A, section 3, subdivision (b) ("exception 4"). The court further concluded that the reasonable cost requirement of article XIII A, subdivision (d), did not apply to exception 4 based on the plain meaning of the language used in section 3. Because the first three exceptions to the general definition of "tax" contain language limiting the charge to

25

reasonable costs and the fourth and fifth exceptions do not, the court concluded it could not read the limitation into the latter exceptions.

Appellants argue the trial court's ruling "is a perversion of Proposition 26, which was intended to reinforce and strengthen existing taxpayer protections by closing loopholes," not to "open new ones" and provide the Legislature with a "free pass" for charges collected at the entrance to state property that make it "easier for the government to hide taxes within fees."

We construe provisions added to the California Constitution pursuant to the same principles governing construction of a statute. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 (*Professional Engineers*); *Schmeer, supra,* 213 Cal.App.4th at p. 1316.) "We first examine the language of the initiative as the best indicator of the voters' intent. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 321.) We give the words of the initiative their ordinary and usual meaning and construe them in the context of the entire scheme of law of which the initiative is a part, so that the whole may be harmonized and given effect. (*Professional Engineers, supra,* at p. 1037; *State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043.) [¶] If the language is unambiguous and a literal construction would not result in absurd consequences, we presume that the voters intended the meaning on the face of the initiative and the plain meaning governs. (*Professional Engineers,* [*supra,*] at p. 1037; *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) If the language is ambiguous, we may consider the analyses and arguments contained in the official ballot pamphlet as extrinsic evidence of the voters' intent and understanding of the initiative. (*Professional Engineers, supra,* at p. 1037.)" (*Schmeer,* at pp. 1316–1317.)

In the trial court, appellants argued that the toll increase would come within exception 4 only if the state demonstrated that the charge met the requirements of article XIII A, subdivision (d) of section 3, including that the amount was not more than necessary to "cover the reasonable costs of the governmental activity" and that it was "fairly allocated based on each payer's burden on or benefit from the governmental activity."  Appellants portrayed subdivision (d) as requiring a nexus between the entrance charge and use to which the collected revenue would be put, without which the fee would become a tax.

Appellants acknowledged that applying the "reasonableness" requirement of section 3 of article XIII A, subdivision (d) to half of exception 4 (the purchase, rental, or lease of state property) or to exception 5 (fines or penalties imposed due to violations of law) would "produce an absurd result," but argued the requirement nevertheless should be applied to the first half of exception 4, charges "for entrance to or use of state property."  Not applying subdivision (d) at all, appellants argued, would be even more absurd, because it would mean there was no limit on the amount of the charge the state could impose for entrance to or use of bridges and parks and no requirement of a nexus between the charge and use of the revenue, which would contravene the intention of Proposition 26 to eliminate taxes disguised as fees.

We agree with the trial court's rejection of this argument.  The first three exceptions to the general definition of "tax" contain language limiting the charge to reasonable costs; the fourth and fifth exceptions do not.  The absence of "reasonable cost" language in the latter exceptions, when it is present in the first three, strongly suggests the limitation does not apply where it is not stated.  And, as the trial court concluded, reading article XIII A, subdivision (d) of section 3 as applicable to all of the subdivision (b)

27

exceptions would render the express reasonableness language in the first three exceptions surplusage. " 'A construction making some words surplusage is to be avoided.' " (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110, quoting *Dyna–Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1387.)

Appellants have changed their argument on this appeal. Now disavowing any argument that the reasonableness provisions of section 3 of article XIII A, subdivision (d), apply to exception 4, appellants describe subdivision (d) as imposing three burdens—proving the levy, charge, or other exaction is not a tax, proving the amount is no more than necessary to cover the reasonable costs of the governmental activity, and proving the allocation of costs bears a reasonable relationship to the burden on or benefit to the payer—only the first of which applies to exception 4. In a point of agreement with respondents, they now maintain the second and third burdens apply only to the first three exceptions in section 3, subdivision (b), while the first burden applies to all five exceptions. Appellants argue, however, that to meet its burden of proving the toll increase is not a tax pursuant to exception 4, the state must not only identify exception 4 as the exception that makes the toll increase not a tax but must prove the toll increase is " '*for* entrance to or use of state property,' " not " 'for" some other purpose unrelated to the payer's entrance to or use of state property." Judgment on the pleadings was improper, they argue, because they raised a factual question with their allegations that the funds resulting from the toll increase are to be used for improvements to public transit and other programs they do not use when they drive across state-owned bridges.

Appellants say their "for' argument does not seek to apply the reasonable cost burdens of section 3 of article XIII A, subdivision (d) to

28

exception 4, but in effect that is just what it does.  In arguing the toll increase is "for" the purpose of funding projects and programs "unrelated" to crossing the bridges, appellants are arguing that the toll increase is not limited to the cost of making the bridges available for crossing and/or not reasonably tied to the benefit the toll payer obtains in crossing the bridges.  Four of the five exceptions in subdivision (b) are defined by reference to what the levy, charge, or exaction is "for"—a benefit or privilege, a service or product, regulatory costs, and entrance to or use of state property or purchase, rental or lease of state property.  The direct referent of "for" is the action of the state, not the use to which revenues will be put:  The levy, charge or exaction is "for" the state conferring a benefit or granting a privilege; providing a service or product; issuing a permit or performing an investigation; permitting access to or use of, or selling, renting or leasing state property.  The first three exceptions expressly limit the amount of the charge; the last two do not.  Notably, the reasonable costs of the state activities at issue in the first three exceptions can be determined by direct reference to the benefit offered, service provided, or administrative action taken.  There is no similarly self-defining reference point for determining the reasonable cost of allowing entry onto or use of state-owned property, which might include anything from obvious repairs and upkeep to myriad enhancements of the user's experience.  And, as appellants conceded in the trial court, a reasonable costs limitation makes no sense with respect to the state's sale or rental of property or determination of fines and penalties for violations of law.

Article XIII, section 3, subdivision (d), is a burden shifting provision; it does not impose substantive requirements in addition to the those stated in subdivision (b).  "Proposition 26 shifted to the state or local government the

29

burden of demonstrating that any charge, levy, or assessment is not a tax. (*Schmeer*[*, supra*], 213 Cal.App.4th at p. 1322.) This shift in the burden of proof 'was largely a response to *Sinclair Paint*[*, supra,*] 15 Cal.4th [at p. 878],' in which the Supreme Court held that a plaintiff who challenges a fee bears the burden of making a prima facie showing that the fee is invalid. (*Schmeer*, [at p.] 1322.)" (*Templo v. State of California* (2018) 24 Cal.App.5th 730, 738.) Appellants' attempt to turn subdivision (d) into a substantive requirement for proof of the applicability of an exception to the definition of "tax" is not persuasive.[18]

_____

[18] In the recently decided *Zolly v. City of Oakland* (2020) 47 Cal.App.5th 73 (*Zolly*), our colleagues in Division One came to a different conclusion in construing analogous constitutional provisions applicable to local government. Subdivision (e) of section 1 of article XIII C, the local government analog to article XIII A, section 3, subdivision (d), provides: "The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." As under article XIII A, section 3, subdivision (b), for the state, article XIII C, section 1, subdivision (e), defines "tax" as "any levy, charge, or exaction of any kind imposed by a local government" with specified exceptions. The first five of these mirror the exceptions to the state-imposed charges described in article XIII A, section 3, subdivisions (b)(1) through (b)(5), with an express reasonableness requirement in the first three but not in the exception for "[a] charge imposed for entrance to or use of local government property, or the purchase, rental, or lease of local government property." (Art. XIII C, § 1, subd. (e)(5).)

*Zolly* concluded that "a franchise fee, arguably subject to the fourth exemption in article XIII C, section 1, subdivision (e), must still be reasonably related to the value of the franchise. (*Jacks* [*v. City of Santa Barbara* (2017)] 3 Cal.5th [248,] 267.) Only that portion with a reasonable relationship may be exempt from the 'tax' definition. (See *City of San Buenaventura*[*, supra,*] 3 Cal.5th at p. 1214 ['it is clear from the text [of Proposition 26] itself that voters intended to adopt two separate requirements: To qualify as a nontax

## DISPOSITION

The judgments are affirmed.

---

"fee" under article XIII C, as amended, a charge *must satisfy both the requirement that it be fixed in an amount that is "no more than necessary to cover the reasonable costs of the governmental activity,"* and the requirement that "the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity" ' (some italics added, italics omitted)].)" (*Zolly, supra,* 47 Cal.App.5th at p. 88.)

The *Zolly* court viewed the burden of proof provision of article XIII C, subdivision (e), as "requir[ing] that a charge be 'no more than necessary to cover the reasonable costs of the governmental activity' " and, because the provision is silent as to whether it applies to all the exemptions from the definition of "tax" or only the first three, which explicitly include a reasonableness requirement, found it ambiguous. (*Zolly, supra,* 47 Cal.App.4th at p. 87.) The court therefore based its decision on the voters' intent, in passing Proposition 26, to "expand the definition of 'tax' to require more types of fees and charges be approved by two-thirds of the Legislature or by local voters." (*Zolly,* at p. 88.) The *Zolly* court did not engage in the textual analysis that leads us to conclude subdivision (d) of article XIII A, section 3, does not impose a substantive requirement of reasonableness beyond that stated in subdivision (b) of this section. While we respectfully disagree with *Zolly* on the interpretation of the burden of proof provision, we of course express no opinion on the court's ultimate conclusion as to whether and when a franchise fee constitutes a tax.

31

                                             _____

                                             Kline, P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

(A157598, A157972)

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Ethan P. Schulman |
| Attorneys for Appellant: | Howard Jarvis Taxpayers Foundation<br>Jonathan M. Coupal<br>Timothy A. Bittle<br>Laura E. Dougherty |
| Attorneys for Respondent: | Orrick Herrington & Sutcliffe<br>Brian P. Goldman<br>Michael C. Weed<br>Megan McCauley |
| | Adrienne D. Weil |
| | Remcho, Johansen & Purcell<br>Robin B. Johansen<br>Thomas A. Willis<br>Margaret R. Prinzing |